EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: Juan Ortiz Martínez | Queja 2004 TSPR 66 161 DPR _____ |

Número del Caso: AB-2002-131

Fecha: 6 de abril de 2004

Oficina del Procurador General:

Lcda. Edna Evelyn Rodríguez
Benítez
Procuradora General Auxiliar

Lcda. Noemí Rivera de Léon
Procuradora General Auxiliar

Abogado del Querellado:
Por Derecho Propio

Materia: Conducta Profesional
(La suspensión será efectiva el día 30 de abril de 2004 fecha en que se le notificó al abogado de su suspensión inmediata.)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Juan Ortiz Martínez                          AB-2002-131

PER CURIAM

San Juan, Puerto Rico, a 6 de abril de 2004

El 17 de mayo de 2002 el doctor Humberto R. Vázquez Oliveras presentó queja bajo juramento ante la Secretaria de este Tribunal contra el licenciado Juan Ortiz Martínez. Expresó, que durante el mes de septiembre de 2001 fue citado por primera vez por el licenciado Ortiz Martínez quien fungía como investigador y asesor legal de la Comisión de Salud de la Cámara de Representantes, que conducía una investigación sobre el Tribunal Examinador de Médicos de Puerto Rico. Acudió a la referida cita acompañado del licenciado José Colón Rodríguez. El interrogatorio

que se le hizo lo dirigió el licenciado Ortiz Martínez como oficial de dicha comisión legislativa. Durante el curso de dicho interrogatorio y en respuesta a las preguntas formuladas brindó información confidencial al licenciado Ortiz Martínez referente a los asuntos bajo investigación legislativa sobre el Tribunal Examinador de Médicos. Se reunió en tres ocasiones adicionales distintas en la oficina de la Comisión de Salud de la Cámara de Representantes de Puerto Rico con el doctor Ángel García Colón, presidente de la referida comisión, y uno de sus asesores legales el licenciado Luis Rodríguez.[1]

Alega, que posteriormente el 7 de mayo de 2002 a eso de las 9:15 de la mañana acudió nuevamente a la oficina de la Comisión de Salud de la Cámara de Representantes, acompañado inicialmente del licenciado José Colón Rodríguez, donde fueron recibidos por la Directora Ejecutiva de dicha comisión legislativa, señora Inés Otero Figueroa. Inmediatamente después se presentó al lugar el licenciado Ortiz Martínez, asesor legal de esa comisión legislativa. Mientras éste último revisaba su ponencia escrita dirigida a esa comisión se unió al grupo la licenciada Mirsonia Osorio, quien también lo acompañaba. Expresó, que el licenciado Ortiz Martínez lo interrogó

---

[1] El doctor Humberto Vázquez Oliveras fue miembro del Tribunal Examinador de Médicos desde marzo de 1994 a septiembre de 1995. Desde esa fecha hasta el 29 de diciembre de 1999 fungió como Presidente de ese organismo. Desde esa fecha hasta febrero de 2000 actuó como tribuno del Tribunal Examinador de Médicos.

sobre su ponencia escrita y manifestó su criterio sobre varios asuntos allí contenidos.

Alegó, que posteriormente advino al conocimiento de que el licenciado Ortiz Martínez, quien participaba activamente como oficial de la Comisión de Salud de la Cámara de Representantes en la investigación que se realizaba sobre el Tribunal Examinador de Médicos, era a su vez asesor legal de éste último. Adujo que tal situación "materializa un grave conflicto de interés al ser abogado de partes con intereses encontrados", y por tal razón presentó la queja ante nos.

El 20 de junio de 2002 referimos al Procurador General la referida queja para la correspondiente investigación e informe, a tenor con la Regla 14(d) de nuestro Reglamento. El Procurador General rindió su informe el 16 de diciembre de 2002. El 14 de marzo de 2003 devolvimos el asunto al Procurador General para ampliar su investigación y rendir informe, que debía ser acompañado con las declaraciones juradas de los testigos.

El 10 de junio de 2003 el Procurador General rindió un nuevo informe. Sostuvo, que a base de su investigación y las declaraciones juradas de los testigos existe violación del querellado a los Cánones 21, 35 y 38 de Ética Profesional.

El 30 de junio de 2003 emitimos resolución concediéndole al querellado un término para expresarse sobre el informe del Procurador General. El 9 de julio de

2003 compareció por escrito ante nos, el querellado y admitió que mientras participaba como asesor legal de la Comisión de Salud de la Cámara de Representantes de Puerto Rico en una investigación que ese organismo legislativo realizaba sobre el Tribunal Examinador de Médicos, otorgó otro contrato de servicios profesionales como asesor legal de éste último. Acompañó con su escrito una certificación de la Oficina de Finanzas y Presupuesto de la Cámara de Representantes de Puerto Rico a los efectos que trabajó para ese cuerpo legislativo, bajo contrato de servicios profesionales, adscrito a la oficina del honorable Rafael García Colón desde el mes de julio de 2001 hasta el 23 de abril de 2002. Presentó, además, una certificación del Tribunal Examinador de Médicos a los efectos que comenzó a prestar servicios profesionales por contrato para esa dependencia de gobierno desde el 14 de marzo de 2002. De ésta última surge que cuando el licenciado Ortiz Martínez solicitó ser considerado para prestar servicios profesionales al Tribunal Examinador de Médicos informó que estaba prestando servicios profesionales por contrato al Presidente de la Comisión de Salud de la Cámara de Representantes de Puerto Rico. Surge de ese documento, además, que el querellado nunca se le asignó ni intervino en el Tribunal Examinador de Médicos en ningún asunto relacionado con investigaciones de la Cámara de Representantes sobre esa entidad. El querellado admitió que prestó servicios profesionales a la misma vez como

asesor legal de la Comisión de Salud de la Cámara de Representantes y del Tribunal Examinador de Médicos desde el 14 de marzo de 2002 hasta el 23 de abril de 2003. No obstante, afirma que a pesar de que de la evidencia presentada por el Procurador General surge una fuerte impresión de que medió un grave conflicto de intereses de su parte la realidad es que contrario a la apariencia creada, en ningún momento el querellado incurrió en un conflicto real de intereses. Puntualizó, que al aceptar el contrato de servicios profesionales del Tribunal Examinador de Médicos puso en conocimiento a esa entidad que tenía un contrato de servicios profesionales con la Comisión de Salud de la Cámara de Representantes.

El querellado aceptó que para el 7 de mayo de 2002, aunque ya no estaba trabajando para la referida comisión legislativa, estuvo presente en las oficinas de ese organismo legislativo y discutió aspectos de la ponencia escrita del doctor Humberto Vázquez Oliveras con éste último. Aunque catalogó de imprudente su proceder le restó importancia porque la información contenida en la ponencia escrita del doctor Vázquez Oliveras no contenía información confidencial. Puntualizó, que de la investigación del Procurador General no surge evidencia que demuestre que él haya incurrido en deslealtad hacia alguno de sus clientes, que haya representado intereses encontrados entre sus clientes, o divulgado información confidencial en poder de alguno de ellos. Solicitó de este Tribunal la

desestimación de la queja o en alternativa que consideremos

lo expuesto por él como atenuante, en vista de su buen

récord como abogado por espacio de once (11)años.


I

El Procurador General concluyó que el aquí querellado

incurrió en violación al Canon 21 de Ética Profesional. Le

asiste la razón. Veamos

El Canon 21 de Ética Profesional[2] dispone lo siguiente:

> El abogado tiene para con su cliente un
> deber de lealtad completa. Este deber
> incluye la obligación de divulgar al cliente
> todas las circunstancias de sus relaciones
> con las partes y con terceras personas, y
> cualquier interés en la controversia que
> pudiera influir en el cliente al seleccionar
> su consejero. Ningún abogado debe aceptar
> una representación legal cuando su juicio
> profesional pueda ser afectado por sus
> intereses personales.

> **No es propio de un profesional el
> representar intereses encontrados. Dentro
> del significado de esta regla, un abogado
> representa intereses encontrados cuando, en
> beneficio de un cliente, es su deber abogar
> por aquello a que debe oponerse en
> cumplimiento de sus obligaciones para con
> otro cliente.**

> **La obligación de representar al cliente
> con fidelidad incluye la de no divulgar sus
> secretos o confidencias y la de adoptar
> medidas adecuadas para evitar su
> divulgación. Un abogado no debe aceptar la
> representación de un cliente en asuntos que
> puedan afectar adversamente cualquier
> interés de otro cliente anterior ni servir
> como árbitro, especialmente cuando el
> cliente anterior le ha hecho confidencias
> que puedan afectar a uno u otro cliente, aún
> cuando ambos clientes así lo aprueban. Será**

---

[2] 4 L.P.R.A. Ap. IX, C. 21.

**altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste**.

Un abogado que representa a una corporación o sociedad le debe completa lealtad a la persona jurídica y no a sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación o sociedad.

Cuando un abogado representa a un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa. (Énfasis nuestro).

El propósito esencial de la referida norma ética es reglamentar la conducta profesional que, de alguna forma, puede poner en peligro el principio de confidencialidad que caracteriza la relación fiduciaria de abogado-cliente y de esa forma menoscabar la imagen de la justicia y la confianza que el ciudadano tiene en el sistema.[3] El conflicto de intereses contemplado con el Canon 21, supra presenta tres (3) situaciones que deben evitarse por los abogados, a saber: que en beneficio de un cliente se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones para con otro cliente; que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés

---

[3] In re Sepúlveda Girón, res. el 24 de octubre de 2001, 2001 T.S.P.R. 153, 155 D.P.R.___(2001), 2001 J.T.S. 157.

de un cliente anterior; y que un abogado acepte una representación legal, o que continúe en ella, cuando su juicio pueda ser afectado por sus intereses personales.[4]

El Canon 21, *supra* prohibe la representación legal cuando existe la posibilidad de que el abogado incurra en conflicto de intereses.[5] Hemos resuelto que existe un conflicto de intereses cuando hay alguna circunstancia que impide la representación libre y adecuada por parte del abogado y vulnera la lealtad absoluta que le debe todo abogado a su cliente.[6]

Para determinar la existencia de un conflicto de intereses por razón de representación dual de un abogado de clientes con intereses encontrados deberá utilizarse la formula de la relación sustancial entre los asuntos presentados por cada uno de los clientes al abogado. No tiene que tratarse de asuntos idénticos o similares. Basta que los asuntos de los que emane el conflicto que está vedado estén sustancialmente relacionados entre sí.[7] No puede aceptarse por un abogado la representación de un

---

[4] Id; In re Bonilla Rodríguez, res. el 17 de julio de 2001, 2001 T.S.P.R. 110, 154 D.P.R.___ (2001), 2001 J.T.S. 111; In re Palou Bosch, 148 D.P.R. 717, 724 (1999); In re Toro Cubergé, 140 D.P.R. 523 (1996).

[5] In re Sepúlveda Girón, supra; In re Soto, 134 D.P.R.772 (1993); Pueblo v. Padilla, 127 D.P.R. 698 (1991); In re Belén Trujillo, 126 D.P.R. 734 (1990); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985).

[6] In re Morell Corrada, res. el 5 de marzo de 2003, 2003 T.S.P.R. 34, 158 D.P.R.___(2003), 2003 J.T.S. 35; In re Belén Trujillo, supra.

[7] In re Sepúlveda Girón, supra.

cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior, independientemente de que ambos lo aprueben.[8] El Canon 21, *supra*, prohíbe tanto la representación concurrente como la sucesiva, siempre que exista una "relación sustancial" entre ambos asuntos, que implica intereses adversos.[9]

Al aplicar las disposiciones del Canon 21, *supra*, ante un planteamiento de representación sucesiva de clientes con intereses adversos, hemos resuelto que no tiene que demostrarse que de hecho ocurrió una violación al principio de confidencialidad. Sólo se requiere que se demuestre que el abogado mantuvo una relación de abogado-cliente con una persona que al tiempo presente tiene una controversia con otra persona que el representa; que la representación legal de su cliente anterior está sustancialmente relacionada con la representación profesional de su cliente actual; y que la representación legal actual resulta adversa a los intereses de su cliente original.[10]

Para determinar la situación de posible conflicto de intereses en cualquiera de las situaciones antes

---

[8] Id; Otaño v. Vélez, 141 D.P.R. 820, 826 (1996); Pesc. Playa Picúas v. US. Inds., Inc.,135 D.P.R. 303 (1994).

[9] P.R. Fuels, Inc. v. Empire Gas Co., Inc., 133 D.P.R. 112, 118-119 (1993); In re Carreras Rovira y Suárez Zayas, 115 D.P.R.778 (1984).

[10] Eliane Exp. LTD v. Maderas Alfa, Inc., res. el 4 de abril de 2002, 2002 T.S.P.R. 41, 156 D.P.R.____(2002), 2002 J.T.S. 46.

indicadas, es indispensable tener en mente que la prohibición del Canon 21, *supra* requiere no sólo la existencia actual del conflicto, sino que se extiende igualmente a conflictos aparentemente existentes, pero que llevan consigo la semilla de un posible o potencial conflicto futuro. Es decir, está también vedado al abogado asumir la representación legal de clientes cuando resulta razonablemente anticipable un futuro conflicto de intereses, aún cuando sea inexistente al momento de la aceptación de la representación legal.[11]

Resulta imprescindible para que entre en vigor la prohibición sobre conflicto de intereses dispuesta en los Cánones de Ética Profesional, la existencia de una relación abogado-cliente dual sobre un asunto o tema.[12]

El querellado subscribió el contrato de servicios profesionales y consultivos, número 2002-000043 para brindar asesoría legal, legislativa, parlamentaria y administrativa a la Comisión de Salud de la Cámara de Representantes de Puerto Rico. Dicho contrato tenía una vigencia del 3 de julio de 2001 al 30 de junio de 2002. El

---

[11] In re Sepúlveda Girón, supra.

[12] In re Cordero Héctor, res. el 5 de septiembre de 2002, 2002 T.S.P.R. 124; In re Bonilla Rodríguez, supra; In re Soto Cardona, 143 D.P.R. 50 (1997).

contrato otorgado era para la prestación de servicios profesionales por el querellado a dicha comisión legislativa y a su presidente, honorable Rafael García Colón.

El 2 de mayo de 2001 la Cámara de Representantes de Puerto Rico ordenó a su Comisión de Salud lo siguiente:

> ...realizar una investigación exhaustiva sobre el funcionamiento del Tribunal Examinador de Médicos de Puerto Rico incluyendo el proceso de revisión de exámenes de reválida, lista de aprobados, lista de suspendidos y lista de aprobados por revisión, hallazgos en auditorias del contralor, acreditación de universidades extranjeras, certificación de especialistas y otras funciones de su cargo.

Surge de las facturas por servicios profesionales prestados por el querellado a la Comisión de Salud de la Cámara de Representantes que éste trabajó directamente con la investigación que esa Comisión Legislativa realizaba sobre el Tribunal Examinador de Médicos. Los servicios profesionales prestados por el licenciado Ortiz Martínez en torno a dicha investigación, según surge de las facturas presentadas por éste, son las siguientes:

**Julio 2001**

> Revisar la información recopilada en torno a las investigaciones que se están realizando en torno al Tribunal Examinador de Médicos (TEM) y del programa WIC del Departamento de Salud.

> Entrevistas a los Sres. Ramón Almodóvar y Levy Arroyo y a la Sra. Edna Morales respecto a la investigación realizada al TEM.

Entrevistas al Sr. Francisco Acevedo y a la Sra. Jeannette Pérez respecto a la investigación realizada al TEM.

Continuación del análisis de la información obtenida en las investigaciones que están efectuando, específicamente en torno a la información obtenida de una computadora relacionada con trabajos efectuados para el TEM.

**Agosto 2001**

Revisar la información recopilada en torno a las investigaciones que se están realizando en torno al Tribunal Examinador de Médicos (TEM) y del programa WIC del Departamento de Salud. Establecer un plan de trabajo para el mes; informar al legislador sobre los hallazgos encontrados hasta el momento, redactar correspondencia para nuevas citaciones, preparación para comenzar vistas sobre la investigación del TEM.

Entrevistas a los Sres. Ramón Almodóvar y Levy Arroyo y a la Sra. Edna Morales respecto a la investigación realizada al TEM.

Entrevistas a la Sra. Elba Flores Villegas, Secretaria del TEM, respecto a la investigación realizada al TEM. Revisión del Reglamento del TEM.

Entrevista a Sra. Ivonne M. Fernández Colón, exdirectora ejecutiva del TEM, y a Yolanda Rodríguez Torres, Recaudadora del TEM.

Entrevista al Lcdo. Pablo Valentín, Director Ejecutivo del TEM.

**Septiembre 2001**

Revisar la información recopilada en torno a las investigaciones que se están realizando del Tribunal Examinador de Médicos (TEM) y preparación para las vistas públicas a celebrarse este mes.

Analizar varios documentos legales en las facilidades del TEM, escoger los documentos necesarios para nuestra investigación y hacerlos formar parte del expediente.

Entrevista al Dr. Humberto Vázquez respecto a la investigación realizada sobre el TEM, redacción de cartas y llamadas telefónicas para el comienzo de las vistas públicas, organización de la información recopilada para comenzar las vistas públicas.

Asistencia y asesoramiento en la primera vista pública en torno a la investigación efectuada al TEM.

El querellado participó activa e intensamente en la investigación que realizaba la Comisión de Salud de la Cámara de Representantes de Puerto Rico sobre el Tribunal Examinador de Médicos. Obtuvo una gran cantidad de información de esa entidad. Examinó un extenso número de documentos de la misma, incluyendo la revisión de su Reglamento. Entrevistó varios funcionarios y ex-funcionarios de la entidad. Asistió y asesoró al Presidente de esa comisión legislativa en la primera vista pública celebrada en torno a la referida investigación.

De la cláusula novena del contrato de servicios profesionales otorgado entre el querellado y la Comisión de Salud de la Cámara de Representantes de Puerto Rico se desprende claramente la intención de ese cuerpo legislativo de que el querellado, como su abogado, no prestara servicios profesionales a otra dependencia de gobierno que pudiera presentar un conflicto de intereses.

La cláusula novena del referido contrato reza de la forma siguiente:

> Novena: Conflicto de Intereses: El Consultor certifica a La Cámara de Representantes que no presta servicios profesionales de asesoría bajo nombramiento o contrato en otra agencia, departamento, dependencia, oficina, negociado, administración, corporación pública o municipio del Estado Libre Asociado de Puerto Rico que constituya o represente un conflicto de interés al asumir posiciones contradictorias en los servicios a que se obliga a prestar bajo el presente contrato de servicios profesionales.

De esa cláusula contractual se desprende claramente la obligación del querellado de no prestar servicios profesionales a ninguna dependencia de gobierno que constituya o represente un conflicto de interés. El 7 de marzo de 2002 el querellado otorgó un contrato de servicios profesionales y consultivos con el Departamento de Salud de Puerto Rico para ofrecer asesoría legal al Tribunal Examinador de Médicos con vigencia del 7 de marzo de 2002 al 30 de junio de 2002. Para la fecha en que se otorgó el referido contrato estaba vigente el contrato de servicios profesionales con la Comisión de Salud de la Cámara de Representantes. Al otorgar ese contrato con el Tribunal Examinador de Médicos el querellado comenzó a trabajar con la dependencia de gobierno que estuvo investigando durante varios meses a tenor con el contrato vigente que mantenía con la Cámara de Representantes. El querellado no informó de esa situación al Presidente ni a la Directora Ejecutiva de la Comisión de Salud del

referido cuerpo legislativo. La carta de renuncia del querellado a sus funciones como asesor legal de la Comisión de Salud de la Cámara de Representantes y dirigida a su Presidente, honorable Rafael García Colón tiene fecha del 10 de mayo de 2002. En dicho escrito el querellado señala que dio por terminado su contrato con la Comisión de Salud de ese cuerpo legislativo, retroactivamente al 23 de abril de 2002, y de que había informado al Presidente de la referida comisión legislativa que había otorgado el contrato de servicios profesionales con el Tribunal Examinador de Médicos. No obstante, lo declarado por la señora Otero, Directora Ejecutiva de la Comisión de Salud lo contradice.

El querellado incurrió en violación a lo dispuesto en el Canon 21, *supra*. Otorgó un contrato de servicios profesionales con el Tribunal Examinador de Médicos estando vigente su contrato con la Comisión de Salud de la Cámara de Representantes y, mientras continuaba vigente la referida investigación legislativa sobre esa dependencia de gobierno. El querellado tenía acceso y obtuvo información privilegiada del Tribunal Examinador de Médicos como asesor de la Comisión de Salud de la Cámara de Representantes. Se personó a la oficina de la Directora Ejecutiva de la referida Comisión de Salud, en ocasión de que estaban llevando a cabo funciones propias de esa investigación legislativa. Intervino con un deponente a ser escuchado en vista pública y con sus

abogados, todos ex-funcionarios del Tribunal Examinador de Médicos, cuando ya éste trabajaba para éste último. Su comportamiento dio la impresión al quejoso que para el 7 de mayo de 2002 éste trabajaba para esa comisión legislativa. Obtuvo una copia de la ponencia escrita que habría de vertir el doctor Vázquez Oliveras durante la celebración de la vista pública, le hizo preguntas al referido galeno sobre la misma y discutió con éste y sus acompañantes asuntos contenidos en la misma, formulando criterio sobre algunos de ellos.

Es éticamente insostenible que un abogado ostente en realidad o en apariencia la representación simultánea o sucesiva de partes con intereses encontrados, o con un potencial conflicto de los mismos.   El conflicto de intereses no tiene que estar establecido claramente, basta con que el mismo sea potencial.[13]  El cuadro fáctico que surge del informe del Procurador General y del escrito del propio querellado refleja claramente la presencia de un grave conflicto de interés de éste último.


                              II

El Procurador General concluyó que el querellado incurrió en violación al Canon 35 de Ética profesional. Le asiste la razón.  Veamos:

_____

[13] In re Bonilla Rodríguez, supra.

El canon 35 de Ética Profesional[14] dispone, en lo aquí pertinente, lo siguiente:

> **Sinceridad y honradez**
>
> **La conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada.**
> **No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgar a error utilizando artificios o una falsa relación de los hechos o del derecho. Es impropio variar o distorsionar las citas jurídicas, suprimir parte de ellas para transmitir una idea contraria a la que el verdadero contexto establece u ocultar alguna que le es conocida.**
> El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar affidávit u otros documentos, y al presentar causas. El destruir evidencia documental o facilitar la desaparición de evidencia testifical en un caso es también altamente reprochable.(Énfasis Suplido).

No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad. Esta norma ética le impone a los abogados unas normas mínimas de conducta que sólo pretenden preservar el honor y la dignidad de la profesión.[15]

Todo abogado tiene la ineludible obligación de ajustarse a la fidelidad de los hechos. Ceñirse a la verdad va más allá que ocasionar perjuicio a tercero o deliberadamente defraudar o engañar. La verdad es un

---

[14]   4 L.P.R.A. Ap. IX, C. 35.

[15] In re Collazo Sánchez, res. el 30 de junio de 2003, 2003 T.S.P.R. 128, 159 D.P.R.___(2003), 2003 J.T.S. 128; In re

atributo inseparable  del ser abogado y, sin la misma, no podría la profesión jurídica justificar su existencia.[16]

No actuó con sinceridad el querellado al no informarle al Presidente y a la Directora Ejecutiva de la Comisión de Salud de la Cámara de Representantes de Puerto Rico que estando vigente el contrato con ese cuerpo legislativo otorgó otro contrato de servicios profesionales con el Tribunal Examinador de Médicos, organismo sujeto a investigación por esa comisión legislativa. Tampoco actuó con sinceridad el 7 de mayo de 2002 al no informarle, al deponente doctor Vázquez Oliveras, exfuncionario del Tribunal Examinador de Médicos y a los abogados que lo acompañaban que para esa fecha él era asesor legal de ese organismo, aclaración que  él estaba obligado a hacer pues dichas personas lo conocían como asesor legal de la Comisión de Salud de la Cámara de Representantes.

---

Sepúlveda Girón, supra; In re  Belk, Serapión, 148 D.P.R. 685 (1999).

[16] In re Montañéz Miranda, res. el 18 de septiembre de 2002, 2002 T.S.P.R. 122, 157 D.P.R.___(2002), 2002 J.T.S. 123; In re Sepúlveda Girón, supra; In re Silvagnoli Collazo, res. el 29 de junio de 2001, 2001 T.S.P.R. 106, 154 D.P.R. ____ (2001), 2001 J.T.S. 109; In re Martínez Odell III, 148 D.P.R. 636 (1999).

III

El Procurador General concluyó que el querellado incurrió en violación al Canon 38 de Ética Profesional.[17] Le asiste la razón.  Veamos.

El Canon 38, *supra*, en lo pertinente dispone, lo siguiente:

**Preservación del honor y dignidad de la profesión**

El abogado deberá esforzarse, al máximo de su capacidad  en la  exaltación del honor y dignidad de su profesión,  aunque  el  así hacerlo conlleve sacrificios personales y debe evitar  hasta  la  apariencia  de  conducta profesional impropia.

La apariencia de conducta impropia puede resultar muy perniciosa al respeto de la ciudadanía a sus instituciones de  justicia y a la confianza que los clientes depositan en sus abogados.  La apariencia de conducta impropia o conflicto de intereses puede tener un efecto tan dañino sobre la imagen, confianza y respeto del público por  su gobierno, como  la verdadera impropiedad ética.  No obstante, este  tipo  de  conducta  impropia  tiene  que sostenerse sobre la apariencia que se da  al público de la violación  efectiva de alguno  de los Cánones de  Ética Profesional.[18]  Ciertamente,  la conducta del querellado constituye,  en la realidad y en apariencia, una impropia

---

[17] 4 L.P.R.A., Ap. IX, C 38.

[18]    In  re  García  Muñoz,  res.  El  5  de  diciembre  de  2003, 2003 T.S.P.R. 175; In re Sepúlveda Giron, supra In re Vélez Barlucea, res. El 26 de octubre de 2000, 2000 T.S.P.R. 158, 152 D.P.R.____ (2000), 2000 J.T.S. 170.

a tenor con  el Canon 38, *supra*.  Dicho comportamiento no sólo   atentó   contra   la   relación   de   fiducia   y confidencialidad idónea de toda relación abogado-cliente, sino que  también perjudicó  el respeto y confianza del pueblo en nuestro  sistema de gobierno.

En el caso ante  nos la conducta del  querellado fue altamente impropia  al  otorgar un  contrato  de servicios profesionales  con  el  Tribunal  Examinador  de  Médicos, dependencia  de  gobierno  que  estaba  investigando  como asesor  legal  de la  Comisión de  Salud de la Cámara de Representantes. Fue  impropia, además,  la conducta del querellado  al  reunirse  en  la  oficina  de  la  Directora Ejecutiva  de  la  Comisión  de  Salud  de  la  Cámara  de Representantes  con  el  doctor  Vázquez  Oliveras  y  los abogados que lo  acompañaban, examinar su ponencia, que era parte del proceso de la investigación en curso sobre el Tribunal Examinador de Médicos, ocultándoles a éstos que ya él era asesor legal de  esa dependencia.

IV

Por  los  fundamentos  antes  expuestos  procede  que decretemos  la  suspensión  inmediata  del  licenciado  Juan Ortiz  Martínez  del  ejercicio  de  la  profesión  de  abogado por  un  término  de  tres  (3)  meses,  a  partir  de  la notificación a  las partes con copia de la sentencia a dictarse y hasta que otra cosa disponga este Tribunal.

Le  imponemos  al  querellado  el  deber  de  notificar  a todos sus  clientes de su presente inhabilidad de seguir

representándoles, devolver cualesquier honorarios recibidos por trabajos no realizados, e informar oportunamente de su suspensión a los distintos foros judiciales y administrativos del País.

Deberá, además, certificarnos dentro del término de treinta (30) días, a partir de su notificación el cumplimiento de estos deberes, notificando también de ello al Procurador General.

El alguacil de este Tribunal procederá a incautarse de la obra notarial de el abogado Juan Ortiz Martínez, incluyendo su sello notarial, debiendo entregar la misma a la Oficina de Inspección de Notarías para el correspondiente examen e informe a este Tribunal

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Juan Ortiz Martínez                          AB-2002-131

SENTENCIA

San Juan, Puerto Rico, a 6 de abril de 2004

Por los fundamentos antes expuestos procede que decretemos la suspensión inmediata del licenciado Juan Ortiz Martínez del ejercicio de la profesión de abogado por un término de tres (3) meses, a partir de la notificación a las partes con copia de la sentencia a dictarse y hasta que otra cosa disponga este Tribunal.

Le imponemos al querellado el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándoles, devolver cualesquier honorarios recibidos por trabajos no realizados, e informar oportunamente de su suspensión a los distintos foros judiciales y administrativos del País.

Deberá, además, certificarnos dentro del término de treinta (30) días, a partir de su notificación el cumplimiento de estos deberes, notificando también de ello al Procurador General.

El alguacil de este Tribunal procederá a incautarse de la obra notarial de el abogado Juan Ortiz Martínez, incluyendo su sello notarial, debiendo entregar la misma a la

Oficina de Inspección de Notarías para el correspondiente examen e informe a este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.

Notifíquese personalmente al querellado con copia de la Opinión que antecede y de esta Sentencia.


                         Patricia Otón Olivieri
                    Secretaria del Tribunal Supremo